**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 30 2012, 9:08 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**T. MICHAEL CARTER**
Scottsburg, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JOSEPH Y. HO**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ROBERT ALLEN BARKER, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 36A05-1108-CR-401 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE JACKSON CIRCUIT COURT
The Honorable William E. Vance, Judge
Cause No. 36C01-0705-MR-3

**May 20, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Following a jury trial, Robert Allen Barker was convicted of murder, a felony, and adjudicated a habitual offender. The trial court imposed an executed sentence of fifty-seven years enhanced by thirty years for being a habitual offender. On appeal, Barker argues that his eighty-seven-year sentence is inappropriate.

We affirm.

The victim in this case, William Dean Jackson, nicknamed Dino, moved in with Barker in the fall of 2006. Barker's Jackson County home was a drug house in which people came regularly to purchase and use drugs sold by Barker. Dino often acted as a "door man" for Barker, keeping the peace and collecting money. *Transcript* at 872. Barker obtained the drugs he dealt from Louisville, where he made runs two or three times a day.

Sometime before Christmas 2006, several items turned up missing at Barker's residence. Barker was angry and told others that he suspected Dino stole from him. Thereafter, on or about December 27, Barker was informed that Dino had raped Barker's girlfriend earlier that day while Barker was on a drug run to Louisville with Tim Wilkerson (Barker's friend and driver). Despite learning this, Barker and Wilkerson completed a second trip to Louisville before Barker returned home with the stated intention of killing Dino.

When Barker and Wilkerson arrived back at the house, Dino was there with a girl named Nikki and her two children. The four adults hung out and smoked cocaine together late into the night. During this time, Barker made phone calls to his ex-wife, Stacey Staley, in which he indicated that he was going to kill Dino (i.e., "put a bullet in his head") but had to wait until Nikki left. *Id*. at 111. Wilkerson eventually drove Nikki and her children home.

2

He returned shortly thereafter and "continued getting high" with Dino and Barker. *Id*. at 56. At some point, Dino went into the bathroom to brush his teeth. Barker proceeded to the bathroom and shot Dino in the back of the head. Barker and Wilkerson then wrapped Dino's body in the shower curtain and loaded the body into the back of Wilkerson's truck. They took the body to a bridge in another town and dumped it into a river. The two smoked cocaine as they went to a bridge in another town and disposed of other evidence.

In the early morning hours after the shooting, Barker called his ex-wife again and indicated, "it was done." *Id*. at 116. Later, Barker informed his girlfriend that he had shot Dino in the head for her. Though many had heard rumors of the shooting, Barker was able to continue dealing drugs and did not become a suspect in Dino's disappearance until February 14, when Barker's ex-wife contacted the police.

The police began searching for Barker late on February 16. Realizing the police were looking for him, Barker enlisted the help of several individuals in an attempt to evade capture. In the early morning hours of February 17, Barker went to Kim Brewer's home where he told her about the shooting. She told him he would have to leave, but she agreed to give him a ride to a friend's house. On the way, Brewer realized she was being followed and told Brewer she would like to pull over. He told her to keep going, but they eventually encountered a "fleet of police officers" in vehicles. *Id*. at 379. Barker, who was armed with a loaded handgun, told Brewer he was going to get out of the vehicle and "go out in style." *Id*. 380. Brewer interpreted this to mean that he was going to engage in a shootout with police. She begged him not to because she would be caught in the line of fire. Barker said he understood and then surrendered to police. Dino's body was recovered on March 17,

2007.

On May 3, 2007, the State charged Barker with murder and class B felony possession of a firearm by a serious violent felon. The State also alleged that Barker was a habitual offender. The State filed amended informations on May 24, 2011. Barker then sought severance of the offenses, which the trial court granted.[1] The jury trial on the murder charge commenced June 1, 2011. Following a guilty verdict, Barker waived a jury trial and admitted his status as a habitual offender. On July 18, the trial court sentenced Barker to fifty-seven years for murder, enhanced by thirty years for being a habitual offender. The trial court also ordered the sentence to be served consecutively to sentences in two other causes, for offenses committed while he was jailed awaiting his murder trial. Barker now appeals, claiming that his eighty-seven-year sentence is inappropriate.

We have the constitutional authority to revise a sentence if, after careful consideration of the trial court's decision, we conclude the sentence is inappropriate in light of the nature of the offense and character of the offender. *See* Ind. Appellate Rule 7(B); *Anglemyer v. State*, 868 N.E.2d 482 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218. The burden of persuading

---

[1] The firearm possession charge proceeded under lower cause number 36C01-0702-FB-7. Barker pleaded guilty to that offense on August 11, 2011. This court affirmed Barker's sentence in that case in a memorandum decision on May 9, 2012. *Barker v. State*, No. 36A01-1109-CR-00405. Among other things, we upheld the trial court's decision to order the thirty-two-year sentence to be served consecutive to the sentence imposed in the instant murder case. *See* slip op. at 5 ("Barker cannot prevail upon his claim – unsupported by authority – that he should receive leniency because he will likely spend his remaining life in jail due to the consecutive nature of his sentences").

4

us that the sentence is inappropriate is on the defendant. *Rutherford v. State*, 866 N.E.2d 867 (Ind. Ct. App. 2007).

Even if a trial court follows the appropriate procedure in arriving at its sentence, we maintain the constitutional power to revise a sentence we find inappropriate. *Hope v. State,* 834 N.E.2d 713 (Ind. Ct. App. 2005). Because sentencing in Indiana is primarily a discretionary function, however, "the trial court's judgment should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). Thus, "[t]he principal role of appellate review should be to attempt to leaven the outliers". *Id*. at 1225. Our analysis of the appropriateness of a sentence "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Id*. at 1224.

Pursuant to Ind. Code Ann. § 35-50-2-3(a) (West, Westlaw current through legislation effective March 20, 2012), a person who commits murder shall be imprisoned for a term of between forty-five and sixty-five years, with the advisory sentence being fifty-five years. Further, Barker was subject to a sentencing enhancement of thirty years for being a habitual offender. *See* I.C. § 35-50-2-8(h) (West, current through legislation effective March 20, 2012).[2] Accordingly, Barker could have received a sentence of between seventy-five and ninety-five years; his sentence of eighty-seven years falls just above the midpoint of the sentencing range.

---

[2] The habitual offender statute provides for an additional fixed term that "is not less than the advisory for the underlying offense" and not more than thirty years. *Id*. Given that the advisory sentence for murder is fifty-five years, the additional fixed term for a habitual offender enhancement in a murder case is necessarily thirty years.

On appeal, Barker does not directly address his character or the nature of the offense. He simply acknowledges that murder is a serious offense and then notes that he admitted being a habitual offender and waived his right to a jury trial on that issue.[3] Barker has wholly failed to persuade us that his eighty-seven-year sentence is inappropriate. Moreover, contrary to his bald assertion on appeal, this sentence is not "very near to the maximum". *Appellant's Brief* at 8.

With respect to the nature of the crime, we observe that Barker planned on killing Dino to seek vengeance for a recent attack on his girlfriend. Barker used drugs with Dino and others while waiting for his opportunity to shoot Dino in the back of the head. Moreover, while waiting, Barker phoned his ex-wife more than once to discuss his plan. After killing Dino, Barker and Wilkerson loaded his body in a truck and dumped it in a river. Dino then went about his usual business of using and dealing drugs. When he became a suspect about six weeks later, Barker attempted to evade capture and came close to engaging in a shootout with police.

Barker's character is one of a man who maintained a drug house and dealt drugs, while armed, on a regular basis. At the age of forty-six, Barker has spent the bulk of his adult life involved in the criminal justice system. The trial court detailed Barker's criminal history as follows:

> The defendant's juvenile record began when he was fifteen. His adult record started when he was eighteen. There are ten juvenile matters on his record, however, except for the theft and burglary, the court has determined that his

---

[3] Barker also indicates that he was praised by the trial court for his behavior and cooperation during the proceedings. This is not in the record before us and is based on statements made by the trial court in a subsequent proceeding in another cause.

other juvenile arrests are minor…. His debut on the adult criminal stage [in 1985] however was significant. Just a month before his nineteenth birthday he committed an armed robbery. In all, he has amassed four felony convictions and thirteen misdemeanor convictions. Particular attention was drawn to the armed robbery and multiple battery convictions and of those, in addition to the four misdemeanor convictions, he has a conviction for battery as a Class C felony and battery as a Class B felony.

*Appellant's Appendix* at 85. Barker has spent a significant portion of his life in prison, has violated probation in the past, and committed crimes (criminal mischief and disorderly conduct) while in jail awaiting trial in the instant case. In sum, he is a dangerous man with a high likelihood of reoffending.

Having considered the nature of the offense and Barker's character, we do not find his slightly greater than advisory sentence to be inappropriate.

Judgment affirmed.

ROBB, C.J., and BAILEY, J., concur.